IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

BRENDA C. NOE, on behalf of herself
and all others similarly situated,

            Plaintiff,

v.                                       CIVIL ACTION NO. 3:19-0690

CITY NATIONAL BANK OF
WEST VIRGINIA,

            Defendant.

## MEMORANDUM OPINION AND ORDER

Presently pending and ripe for review is Defendant City National Bank of West Virginia's "Motion to Dismiss, Motion to Stay, and to Strike Class Action Allegations." *Mot. to Dismiss*, ECF No. 7. Plaintiff Brenda C. Noe timely filed a Response in Opposition, *Resp. in Opp'n*, ECF No. 11, and Defendant did the same with its Reply, *Reply Mem.*, ECF No. 12. The Court further granted leave for Plaintiff to file a limited Surreply. *Surrpely Mem.*, ECF No. 16. The issues have been adequately presented to the Court through the parties' briefing and oral argument is unnecessary. For the reasons set forth below, the Court **DENIES** the motion.

### I. BACKGROUND

This putative class action arises out of Defendant's routine practice of assessing more than one non-sufficient funds ("NSF") fee for a single attempted transaction.[1] *Am. Compl.*, at ¶ 1. Distinct from an overdraft fee, an NSF fee is assessed where a bank rejects an attempted transaction

---

[1] Unless otherwise indicated, the Court draws these facts directly from the Complaint—which, obviously enough, are taken as true at this stage of litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

because of the insufficient balance of a customer's checking account. *See Resp. in Opp'n*, at 1. The particular practice challenged in this case is not the assessment of NSF fees as a whole, but rather the practice of charging multiple NSF fees for one attempted purchase. The issue stems from certain retailers' policies of re-submitting transactions to Defendant for approval—without a customer's knowledge—after it has already been rejected for a single purchase. *See, e.g., Am. Compl.*, at ¶ 15.

Plaintiff—a resident of Glenwood, West Virginia—has held two accounts at City National. *Id.* at ¶ 5; *Reply Mem.*, at 4. The first account was opened in 2012, and is the account that is directly relevant to the instant case.[2] *Reply Mem.*, at 4. In opening the account, Plaintiff assented to a six-page account agreement. *See 2012 Deposit Account Agreement & Disclosure*, ECF No. 7-2, at 30–35. Near the end of the agreement is an arbitration clause, which reads in part:

> ARBITRATION. IT IS IMPORTANT THAT YOU READ THIS ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT YOU MAY BE REQUIRED TO SETTLE A CLAIM OR DISPUTE THROUGH ARBITRATION, EVEN IF YOU PREFER TO LITIGATE SUCH CLAIMS IN COURT. YOU ARE WAIVING RIGHTS YOU MAY HAVE TO LITIGATE THE CLAIMS IN A COURT OR BEFORE A JURY. YOU ARE WAIVING YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT, CLASS ACTION ARBITRATION OR OTHER REPRESENTATIVE ACTION WITH RESPECT TO SUCH CLAIMS. Any claim or dispute ("Claim") by either you or us against the other arising from or relating in any way to your account, this Agreement or any transaction conducted with the Bank or any of its affiliates will, at the election of either you or us, be resolved by binding arbitration. This arbitration provision governs all Claims, whether such claims are based on law, statute, contract, regulation, ordinance, tort, common law, constitutional provision, or any other legal theory . . . .

*Id.* at 34. This agreement governed Plaintiff's account for the next several years without alteration. In December 2017, however, Defendant mailed Plaintiff a "Notice of Change" meant to update

---

[2] The second account was opened on July 1, 2019, the same day the first account was closed. *Reply Mem.*, at 4. While it is unclear why the old account was closed and a new account was opened, this change occurred after the assessment of the NSF fees giving rise to this suit.

the "Terms and Conditions to address the Military Lending Act revision," as well as "to make several other revisions." *Notice of Change*, ECF No. 7-2, at 40–44. The Notice further informed customers that

> Effective 30 calendar days after we sent this notice to you, your account(s) shall be governed by the following terms and conditions. Continued use of your accounts after receipt of these terms and conditions constitutes acceptance of, and agreement to, the terms and conditions.

*Id.* at 40. Plaintiff continued to use her account, signaling her assent to the updated terms. Significantly, however, the updated Terms and Conditions omitted any mention of arbitration. *Resp. in Opp'n*, at 7.

In any event, Plaintiff's continued use of her account gave rise to two transactions that form the basis of this suit. *Am. Compl.*, at ¶¶ 16, 24. In July 2018, Plaintiff attempted to purchase $52.10 worth of items at Cashland. *Id.* at ¶ 16. Defendant rejected the payment due to insufficient funds, and charged Plaintiff a $36.00 NSF fee for doing so. *Id.* at ¶ 17. Weeks later, Cashland apparently re-submitted the transaction to Defendant without Plaintiff's knowledge. *Id.* at ¶ 18. Defendant again rejected the payment, and assessed another $36.00 NSF fee. *Id.* at ¶ 19. The pattern repeated itself once again two weeks later, with another attempted transaction submitted by Cashland and another fee assessed by Defendant. *Id.* at ¶¶ 20–21. In total, Plaintiff was charged $108.00 in NSF fees for a single attempted purchase of $52.10. *Id.* at ¶ 22. This pattern persisted in May 2019 after Plaintiff attempted a payment to Wal-Mart for $25.13. Pursuant to its NSF fee policy, City National charged Plaintiff a $36.00 fee that same day. *Id.* at ¶ 25. Yet over the course of the following weeks, Wal-Mart resubmitted the charge to Defendant four more times. *Id.* at ¶¶ 26–34. These five attempted payments each resulted in $36.00 NSF fee assessments, resulting in a total charge of $180.00 for an attempted transaction of $25.13. *Id.*

Frustrated by these charges, Plaintiff initiated the instant action in this Court on September 20, 2019. *Id.* at 1. Plaintiff brings her claims on behalf of herself and all similarly-situated customers, and argues that Defendant's NSF fee practices breach contractual promises or result in unjust enrichment in the alternative. *Id.* at ¶ 2. She also alleges several violations of the West Virginia Consumer Credit and Protection Act. *Id.* Defendant filed the pending motion on November 22, 2019, arguing for dismissal on several different grounds. Before proceeding to a discussion of these arguments, the Court will undertake a review of the law governing the resolution of this motion.

## II. LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts are mindful that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must provide "fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but need not "make a case" against a defendant or "forecast evidence sufficient to prove an element" of the claim. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005). Rather, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To determine whether a complaint has alleged facially plausible claims, a court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Courts must further "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). On the other hand, courts need not accept as true any unsupported legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When analyzing a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions . . . in particular, documents incorporated into the complaint by reference." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such documents include attachments to a complaint and a motion to dismiss, "so long as they are integral to the complaint and authentic." *Id.* (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)).

As a final matter, "asserting an affirmative defense . . . in a motion to dismiss presents a particular 'procedural stumbling block' for defendants." *CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 728 (4th Cir. Dec. 30, 2010) (unpublished). As "the burden of establishing [an] affirmative defense rests on the defendant . . . . a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of [a] complaint, generally cannot reach the merits of an affirmative defense." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Nevertheless, "in [the] relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in [a] complaint, [a] defense may be reached by a motion to dismiss." *Id.* "This principle only applies, however, if all facts necessary to [an] affirmative defense clearly appear *on the face of the complaint.*" *Id.* (emphasis in original) (internal punctuation omitted).

### III. DISCUSSION

Defendant raises seven arguments in favor of dismissing various parts—or in some cases, all—of the Amended Complaint. The Court considers each argument in turn.

1. **Existence of Arbitration Agreement**

Defendant's first argument—and the one that has attracted the most attention in the parties' briefs—is that the arbitration clause in Plaintiff's 2012 Deposit Account Agreement and Disclosure bars her from pursuing relief in this court. *See Mem. in Support of Mot. to Dismiss*,

ECF No. 8, at 8. This is a critical issue for both parties, as the Federal Arbitration Act "requires a district court, upon motion by any party, to stay judicial proceedings involving the issues covered by written arbitration agreements." *Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709 (4th Cir. 2001). This broad federal policy in favor of arbitration effectively narrows the question before the Court to a single issue: whether Plaintiff and Defendant have entered into a valid agreement to arbitrate. *Bird v. Turner*, No. 5:14CV97, 2015 WL 5168575, at *9 (N.D.W. Va. Sept. 1, 2015). The Court is unable to make such a determination at this stage of litigation, and so dismissal is inappropriate.

As a preliminary matter, the Court acknowledges that both parties have expended significant energy on discussing the Terms and Conditions attached to Plaintiff's 2019 checking account at City National. *See, e.g.*, *Reply*, at 4. Obviously enough, these Terms and Conditions—provided to Plaintiff in July 2019—are completely irrelevant in determining what contractual provisions bound Plaintiff in July 2018 and May 2019. The Court accordingly will not dwell on the question of whether the Terms and Conditions governing Plaintiff's second checking account contain an arbitration clause or whether it was provided separately.

It follows that only two documents are critical in determining whether a valid arbitration agreement bars Plaintiff's claims. The first is her 2012 Depository Agreement, attached as part of Exhibit A to Defendant's Motion to Dismiss. *2012 Deposit Account Agreement & Disclosure*, at 30–35. Both Plaintiff and Defendant agree that this document governed Plaintiff's 2012 account when it was opened. It does not appear that any separate "Terms and Conditions" document was provided to Plaintiff at this time. *See Ex. A*, ECF No. 7-2, at 11–39. The second document at issue is the Notice of Change mailed to Plaintiff in 2017, which purported to change "the Terms and Conditions of your account with us." *Notice of Change*, at 40. The first document contains an

arbitration clause; the second does not. The instant dispute therefore turns on whether the Notice of Change and its attached Terms and Conditions supplanted the arbitration agreement contained in Plaintiff's 2012 Deposit Account Agreement and Disclosure.

The Court therefore undertakes an examination of the Notice of Change, which provides in relevant part that "[t]his is a notice of changes to the Terms and Conditions of your account with us" and that "[e]ffective 30 calendar days after we sent this notice to you, your account(s) shall be governed by *the following* terms and conditions." *Notice of Change*, at 40 (emphasis added). This language is significant. By its own terms, the Notice of Change suggests that the "following terms and conditions"—which do not include an arbitration agreement—govern Plaintiff's account. As the Court is required to draw all reasonable inferences in the Plaintiff's favor at this stage of litigation, *Edwards*, 178 F.3d at 244, it seems clear that the Terms and Conditions appended to the Notice of Change *could* have governed Plaintiff's account at the time of the challenged transaction. Given the lack of any arbitration agreement in these terms, the Court cannot conclude that a valid arbitration clause exists that would preclude this litigation.[3] Though Defendant is free to produce evidence at some future stage of this action tending to demonstrate that the Terms and Conditions supplied to Plaintiff in 2017 did not replace the 2012 Deposit Account Agreement and Disclosure, this is not a question fit for resolution on a motion to dismiss.

---

[3] In an affidavit attached as Exhibit 1 to Defendant's Reply, Sheila Dickens—"First Vice-President, Branch Operations Manager, for City National Bank of West Virginia"—states that "Between July 27, 2012, and July 1, 2019, [Plaintiff] was subject to the arbitration agreement she was provided on July 27, 2012." *Dickens Aff.*, ECF No. 12-1, at ¶ 5. As an initial matter—and as counsel is presumably aware—the Court cannot rely on affidavits in considering a motion to dismiss pursuant to Rule 12(b)(6). *See*, *e.g.*, *Perez v. Staples Contract and Com., Inc.*, No. 3:13-cv-1775-JFA, 2014 WL 4249871, at *7 (D.S.C. Aug. 27, 2014). Even beyond this procedural shortcoming, however, it is the Court's role—not Ms. Dickens'—to determine whether and when Plaintiff was subject to the arbitration agreement.

**2. Electronic Funds Transfer Act**

Defendant's next argument is that Plaintiff's claims are time-barred by the Electronic Funds Transfer Act ("EFTA"). *Mem. in Support of Mot. to Dismiss*, at 11. The EFTA was enacted to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). In part, it requires financial institutions to investigate alleged inaccuracies in a billing statement when a customer notifies them of "an error and the amount of such error" within sixty days of the statement's transmission. 15 U.S.C. § 1693f(a). The EFTA defines an "error" as

> (1) an unauthorized electronic fund transfer; (2) an incorrect electronic fund transfer from or to the consumer's account; (3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included; (4) a computational error by the financial institution; (5) the consumer's receipt of an incorrect amount of money from an electronic terminal; (6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or (7) any other error described in regulations of the Bureau [of Consumer Financial Protection].[4]

15 U.S.C. 1693f(f). After receiving notice of an alleged error, banks have "a duty to 'investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days.'" *Merisier v. Bank of Am., N.A.*, 688 F.3d 1203, 1209 (11th Cir. 2012) (quoting 15 U.S.C. § 1693(a)).

The question before the Court is therefore whether the contested NSF fees represent an "error" in Plaintiff's billing statements subject to the EFTA's sixty-day time bar. Neither the text of the EFTA nor precedent is particularly clear on this point,[5] but Defendant's argument fails for

---

[4] Regulation E, which implements the EFTA, does not substantively change or add to these definitions. *See* 12 C.F.R. § 1005.11.

[5] Defendant cites principally to *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 349–50 (D.N.H. 2018), for the proposition that EFTA statutes of limitations are triggered "when the first allegedly unauthorized fee was charged." *Reply*, at 8. Yet Defendant ignores the fact that

an even more immediate reason: that the very heart of its argument is that the contested NSF fees were *not* errors, but rather contractually-mandated fees assessed on independent transactions.⁶ The Court struggles to conceive of a scenario in which a fee could be justified by a contract and assessed as a regular business practice, yet still be considered an "error" within any reasonable definition of the word. Defendant can have its cake or choose to eat it, but it cannot do both. Plaintiff's claims are not time-barred under the EFTA, and so dismissal is not warranted.

3. **Contractual Right to Assess Fees**

Defendant's third argument is that it possessed a contractual right to assess the NSF fees at issue, and that Plaintiff has therefore failed to state a claim upon which relief can be granted. *Mem. in Support of Mot. to Dismiss*, at 12. Defendant points exclusively to the 2012 Deposit Account Agreement and Disclosure for support, though it also argues that the "documents [Plaintiff] was provided on July 1, 2019, had the same substantive provisions relative to NSF fees and arbitration as did her 2012 documents." *See Reply*, at 11. Both arguments miss the point. Plaintiff does *not* argue that either the 2012 or 2019 agreements applied at the time of the challenged purchases; rather, she contends that her account was governed by the set of Terms and Conditions she was mailed in 2017 when she was assessed the challenged NSF fees. *Resp. in Opp'n*, at 12. As this case progresses, it may well become clear that the 2012 Deposit Account Agreement and Disclosure governed Plaintiff's account in 2018 and the first half of 2019. Yet at this stage of litigation, the Court cannot conclude as a matter of law that the terms of the 2012

---

*Walbridge* involved the statute of limitations found in 15 U.S.C. § 1693m—a provision that applies to all EFTA claims "*except* for an error resolved in accordance with section 1693f of this title." *See* 15 U.S.C. § 1693m(a). This case only implicates 15 U.S.C. 1693f, and so Defendant's reliance on *Walbridge* is misplaced.

⁶ This same logic would also preclude reliance on any contractual terms purporting to bind Plaintiff to a sixty-day time bar for reporting errors in billing statements.

Deposit Account Agreement and Disclosure applied at the time the contested fees were assessed. As Defendant has offered no argument with regard to the Terms and Conditions mailed to Plaintiff in 2017, it is unclear whether Defendant had the contractual right to assess more than one NSF fee for a single attempted purchase. As such, the Court cannot dismiss this case on these grounds.

   **4. Federal Preemption**

Defendant next argues that federal law preempts any "state law claims challenging fees imposed by national banks are expressly preempted by federal law." *Mem. in Support of Mot. to Dismiss*, at 14. For support, Defendant cites to 12 C.F.R. § 7.4002(a)—providing that "[a] national bank may change its customers non-interest charges and fees"—and 12 C.F.R. § 7.4002(d)—providing that the Office of the Comptroller of the Currency ("OOC") "applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees described in this section." Defendant also leans heavily on the recent decision in *Lambert v. Navy Federal Credit Union*, No. 1:19-cv-103-LO-MSN, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), for its argument that plaintiff's claims are preempted by federal law.[7] *Mem. in Support of Mot. to Dismiss*, at 16.

Plaintiff has addressed none of these contentions, and so the Court will do so here. At the outset, the proposition that "state law claims challenging fees imposed by national banks are expressly preempted by federal law" is as overbroad as it is incorrect. *Mem. in Support of Mot. to*

---

[7] Notably, the Defendant in *Lambert* was a federal credit union, not a national bank. *Lambert*, 2019 WL 3843064, at *1. The *Lambert* court accordingly based its analysis on regulations narrowly tailored to such credit unions. *Id.* at *2 ("Consistent with the language and purpose of these regulations, it is well established that state law claims regarding a *federal credit union's* failure to disclose certain fee practices or any perceived unfairness in the fee practices are themselves preempted." (emphasis added)).

*Dismiss*, at 14. Plaintiff's own principal citation makes this point clearly, noting that "it is . . . well established that true breach of contract and affirmative misrepresentation claims"—both state law torts—"are not federally preempted." *Lambert*, 2019 WL 38443064, at *2. Here, Plaintiff has raised claims in three counts. Count One is a claim for breach of contract and breach of the covenant of good faith and fair dealing. *Am. Compl.*, at ¶¶ 67–80. In the alternative, Count Two raises a claim for unjust enrichment. *Id.* at 81–86. Finally, Count Three raises claims for unfair and deceptive acts or practices within the meaning of the West Virginia Consumer Credit and Protection Act. *Id.* at ¶¶ 87–103. These are precisely the sort of claims that are *not* preempted by federal law. *See*, *e.g.*, *Lambert*, 2019 WL 38443064, at *2 (claims for breach of contract and affirmative misrepresentation not federally preempted); *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012) (claims raised under fraudulent prong of state unfair competition law not federally preempted); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 575, 583 (E.D. Va. 2014) (claims for breach of contract and breach of covenant of good faith and fair dealing not federally preempted); *Murr. v. Capital One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 583 (E.D. Va. 2014) (claims for fraud not federally preempted). To the extent Defendant cites other cases to support dismissal, the common thread running through each opinion is the existence of an undisputed, operative contract binding Plaintiff to pay NSF fees and the attendant absence of any non-preempted claim. *See Reply*, at 12 n.44. The Court is therefore precluded from dismissing Plaintiff's claims on preemption grounds.

5. **Common Law Claims**

Defendant's fifth argument is that Plaintiff cannot state a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, or unjust enrichment. *Mem. in Support of Mot. to Dismiss*, at 17. This argument is closely linked to Defendant's third argument,

which claims that the 2012 Deposit Account Agreement and Disclosure authorizes it to charge successive NSF fees for the same purchase. This argument fails for the same reason as its earlier counterpart: it is not clear at this point whether the Terms and Conditions included in the December 2017 Notice of Change—which do not include the same NSF fee provisions as the 2012 Deposit Account Agreement and Disclosure—were governing Plaintiff's account at the time of the contested purchases.

With all this in mind, Plaintiff has stated a claim for relief under a theory of breach of contract. Under West Virginia law, "the elements of breach of contract are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach." *Wittenberg v. Wells Fargo Bank, N.A.*, 852 F. Supp. 2d 732, 749 (N.D.W. Va. 2012). Plaintiff has alleged each element in her Amended Complaint. *Am. Compl.*, at ¶¶ 67–80. With respect to Plaintiff's claim for breach of the covenant of good faith and fair dealing, Defendant points out that "this covenant does not provide a cause of action apart from a breach of contract claim" in West Virginia. *Mem. in Support of Mot. to Dismiss*, at 17 (quoting *Evans v. United Bank*, 775 S.E.2d 500, 509 (W. Va. 2015) (internal quotations omitted)). This is true enough, but the Court does not read the Amended Complaint as raising a separate claim for breach of the implied covenant of good faith and fair dealing. Rather, the Amended Complaint recognizes the fact that West Virginia law "implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Stand Energy Corp. v. Columbia Gas Transmission*, 373 F. Supp. 2d 631, 644 (S.D.W. Va. 2005). Plaintiff acknowledges as much by raising her claim for breach of contract and breach of the covenant of fair dealing in a single count, and by explicitly noting that "an implied covenant of good faith and fair dealing govern[s]

every contract." *Am. Compl.*, at ¶ 74. As Plaintiff has not raised a separate claim for breach of the covenant of good faith and fair dealing, dismissal is unwarranted.

Finally, Plaintiff has also stated a claim under a theory of unjust enrichment. She recognizes that her "breach of contract claim cannot be tried along with unjust enrichment," and brings the claim "solely in the alternative." *Id.* at ¶ 82. Simply put, "under federal law, a plaintiff is permitted to plead unjust enrichment as an alternative to contract recovery 'when the terms of a contract or the parties to said contract are disputed.'" *Span Constr. & Eng'g, Inc. v. Uwharrie Builders, LLC*, No. 3:18-CV-178, 2019 WL 1574233, at *2 (N.D.W. Va. Jan. 30, 2019) (internal punctuation and quotations omitted); *see also Ford v. Torres*, No. 1:08cv1152, 2009 WL 537563, at *4 (E.D. Va. Mar. 3, 2009) ("Even though Plaintiffs will not be able to recover under both contract and quasi-contract doctrines . . . they are not barred from pleading alternative theories of recovery where the existence of a contract concerning the subject matter is in dispute." (internal quotations and citations omitted)). Plaintiff has thus stated a claim for unjust enrichment in the alternative to her claims in Count One, and dismissal is not appropriate.

  **6. West Virginia Consumer Credit and Collection Act**

Defendant also argues that Plaintiff has not stated a claim under the West Virginia Consumer Credit and Collection Act ("WVCCCA"). *Mem. in Support of Mot. to Dismiss*, at 18. Like its argument with respect to Plaintiff's common law claims, this is incorrect. The WVCCCA is an expansive piece of consumer protection legislation whose "purpose . . . is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition." W. Va. Code § 46A-6-101. Under the WVCCCA, the term "unfair methods of competition and unfair or deceptive acts or practices" means, *inter alia*, "[a]dvertising goods or services with intent not to sell them as

advertised" and "[e]ngaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." W. Va. Code § 46A-6-102(7). In turn, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." W. Va. Code § 46A-6-104. Finally, West Virginia Code § 46A-6-106(a) creates a private cause of action to recover damages for a party who suffers a loss "as a result of the use or employment by another person of a method, act or practice prohibited or declared to be unlawful by the provisions" of the WVCCCA. With this statutory framework in mind, Plaintiff extensively argues that Defendant's practice of charging more than one NSF fee for a single transaction without clearly alerting customers is confusing or misleading conduct that would fall within the ambit of the WVCCCA. *See*, *e.g.*, *Am. Compl.*, at ¶ 47 ("Banks like [Defendant] that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders— something Defendant here never did."). For the purposes of a motion to dismiss, then, Plaintiff has sufficiently alleged that Defendant's conduct constitutes an unlawful practice under the WVCCCA.[8]

As a final matter, Defendant once again argues that federal law preempts Plaintiff's WVCCCA claims. Once again, this is not the case. It is true that the federal law affords regulators the power to define certain "incidental powers" of national banks, *see* 12 U.S.C. § 93a, and that

---

[8] Defendant does raise a meritorious question: whether a checking account and associated transactions are appropriately considered "goods or services" within the meaning of the WVCCCA. *Mem. in Support of Mot. to Dismiss*, at 19. At this stage of litigation, it is sufficient that Plaintiff has alleged that "[b]anking accounts, financial services, overdraft protection, and processing payment, and rejection of debit card transactions constitute a 'service' as defined by W. Va. Code § 46A-1-102(47)." Nevertheless, Defendant's argument on this question is well-taken. At future stages of this action, the Court will be required to determine whether the practice of assessing NSF fees is a "service" covered by the WVCCCA, either by interpreting the statute directly or certifying the question to the Supreme Court of Appeals of West Virginia.

those regulators have interpreted these powers to encompass non-interest charges and fees like those at issue here, 12 C.F.R § 7.4002(a). Yet these same regulators have also made clear that banks may face "consequences [for] engaging in practices that may be unfair or deceptive under federal or state law." OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *1 (Mar. 22, 2002). Persuasive case law makes a similar point. In considering preemption, courts ask whether a state law "prevents or significantly interferes with the national bank's exercise of its powers." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996). Where a state law does not "conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties," that law may be invoked against a national bank. *Bank of Am. v. City and Cnty. of San Francisco*, 309 F.3d 551, 563 (9th Cir. 2002). Relevant to this case, "[s]tate laws of general application, which merely require all businesses (including national banks) to refrain from fraudulent, unfair, or illegal behavior, do not necessarily impair a bank's ability to exercise its . . . powers." *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010). It follows that Plaintiff's claims under the WVCCCA are not preempted by federal law, and may not be dismissed.

7. **Bar on Class Relief**

Defendant's final argument is that Plaintiff's class allegations must be stricken because no cause of action states a claim for class relief and the arbitration clause of the 2012 Deposit Account Agreement and Disclosure bars class actions. *Mem. in Support of Mot. to Dismiss*, at 19–20. This second contention does not warrant further discussion; as has been exhaustively noted, it is not clear that the arbitration clause governed Plaintiff's account at the time of the challenged transactions. Yet Defendant's argument fails for an even clearer reason: it is unquestionably premature. Indeed, "[c]ourts consistently deny such motions [to strike class allegations] because

class allegations should not be addressed at the pleading stage, before [P]laintiff has had full opportunity for discovery and to revise the class definition as necessary." *Alig v. Quicken Loans Inc.*, No. 5:12-CV-114, 2015 WL 13636655, at *3 (N.D.W. Va. Oct. 15, 2015). This is precisely why Rule 23(c)(1) of the Federal Rules of Civil Procedure was amended: to require courts to determine whether to certify a lawsuit as a class action "at an early practicable time" rather than at the pleading stage. *Id.* at *2.

Still, Defendant contends that this is the rare case in which a "pleading makes clear that the purported class cannot be certified and no amount of discovery would change that determination." *Waters v. Electrolux Home Prod., Inc.*, No. 5:13CV151, 2016 WL 3926431, at *4 (N.D.W. Va. July 18, 2016). Defendant is wrong; as Plaintiff points out, classes have been certified in overdraft cases alleging similar breach of contract, unjust enrichment, and state law unfair practices claims. *See In re TD Bank, N.A. Debit Card Overdraft Fee Litigation*, 325 F.R.D. 136 (D.S.C. 2018). Defendant attempts to dismiss this unfavorable precedent by pointing out that "Plaintiff's depository agreement has changed somewhat over the years." *Reply*, at 20 n.71. Why this should have any effect on Plaintiff's ability to conduct discovery before moving to certify the putative class is left entirely unexplained, and flies in the face of Defendant's own oft-repeated argument that the agreement governing Plaintiff's account has remained fundamentally the same since 2012.

In sum, Defendant advances no argument that can justify a stay of this action—let its alone dismissal. Striking Plaintiff's class allegations is likewise premature. Discovery in this case will no doubt solicit evidence tending to demonstrate whether the Terms and Conditions attached to the Notice of Change governed Plaintiff's account at the time of the contested transactions, as well as whether Plaintiff can establish the numerosity, commonality, typicality, and adequacy of

representation necessary to certify a class. For the limited purposes of a motion to dismiss, however, Plaintiff's claims will proceed.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion, ECF No. 7, in its entirety.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER: February 19, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE